# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRENDA BELDEN, | ) 1:05cv0421 JMD |
| | ) |
| | ) |
| | ) ORDER REGARDING PLAINTIFF'S |
| Plaintiff, | ) SOCIAL SECURITY COMPLAINT |
| | ) |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## BACKGROUND

Plaintiff Brenda Belden ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable John M. Dixon, Jr., United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On July 18, 2005, the Honorable Anthony W. Ishii reassigned the case to the Honorable Sandra M. Snyder for all purposes. On June 1, 2007, the Honorable David F. Levi reassigned the case to the undersigned for all purposes.

**FACTS AND PRIOR PROCEEDINGS**[2]

On July 19, 2002, Plaintiff filed an application for SSI benefits. AR 50. She alleged disability since June 9, 2002, due to scoliosis, curvature of the spine causing pain in the lungs, back, hips, and ribs, and arthritis of the spine. AR 65. After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 34-37, 40-43, 44. On August 5, 2004, ALJ James E. Ross held a hearing. AR 232-236. ALJ Ross denied benefits on October 5, 2004. AR 9-16. On December 20, 2004, the Appeals Council denied review. AR 5-8.

<u>Hearing Testimony</u>

Initially, the ALJ scheduled a hearing for March 30, 2004, but Plaintiff did not appear. AR 20-25, 234. The ALJ rescheduled the hearing to August 5, 2004. AR 17-19, 234. On August 5, 2004, ALJ Ross held a hearing in Bakersfield, California. AR 232. Plaintiff's attorney, Geoffrey Hayden, appeared at the hearing. Plaintiff did not appear. AR 234. The ALJ did not receive any hearing testimony. AR 233.

<u>Medical Evidence</u>

On August 1, 1995, Plaintiff underwent chest X-rays at Kern Medical Center. AR 154. She was diagnosed with moderately severe thoracic scoliosis. AR 154.

On May 11, 2001, Plaintiff sought emergency medical treatment for complaints of nausea, vomiting, diarrhea, fever, chills, stomach pain and back pain. AR 147-153.

On August 2, 2001, Plaintiff visited Kern Medical Center for refills of her medications. Her current medications were noted as Paxil, Clonazepam, Levoxl, Darvocet, Buspirone, Nasacort, Pepcid and Vanceril. AR 144. She was assessed with alcohol abuse, hypothyroidism, and allergies. AR 144. She reported that she was pain free. AR 144.

On October 25, 2001, Plaintiff sought treatment at Kern Medical Center for complaints of swollen glands, weight gain and cold intolerance. AR 141. The clinic record notes indicated that Plaintiff had hypothyroidism, arthritis, asthma and alcoholism. She had been in "rehab" since

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1  March. She was diagnosed with hypothyroidism, which was still hypo, scoliosis, and arthritis.
2  AR 141. The provider increased her dosage of Levoxyl. AR 141. On the same date, Plaintiff
3  also underwent a CBC, PT PTT panel, comprehensive metabolic panel, TSH, and Free T4
4  testing. AR 142-143.
5        On January 7, 2002, Plaintiff sought treatment for her asthma. AR 169. Plaintiff
6  complained of feeling shaky. Plaintiff also had depression and complained that her Prozac was
7  not working. She was prescribed Prozac, Proventil inhaler and other medications. AR 169
8        On February 11, 2002, Plaintiff underwent a physical examination and pap smear. AR
9  168. She also sought treatment for depression, anxiety, hypothyroidism, a history of skin cancer,
10 and asthma. AR 168.
11       On February 22, 2002, a PAP smear cytology report revealed a diagnosis of squamous
12 cell abnormalities, high-grade squamous intraepithelial lesion (HGSIL). AR 165. Plaintiff also
13 had human papilloma virus. AR 165. The reviewing pathologists recommended a colposcopy
14 and biopsy. AR 165.
15       On February 25, 2002, Plaintiff sought follow-up treatment for an abnormal pap smear
16 and medication refills. AR 162. She had an abnormal pap, HPV, hypothyroidism, asthma and
17 anxiety. AR 162. The provider adjusted Plaintiff' thyroid medication, noted good control of her
18 asthma and referred Plaintiff to an OB/GYN at Kern Medical Center. AR 162, 163.
19       On March 20, 2002, Plaintiff was seen for her annual pap smear. AR 139-140. She was
20 diagnosed HGSIL. AR 140.
21       On March 25, 2002, Plaintiff sought treatment in the pharmacotherapy clinic at Kern
22 Medical Center for refills on her medications. AR 138. The provider noted that Plaintiff was in
23 counseling for her drinking. AR 138.
24       On March 26, 2002, Plaintiff underwent a colposcopy with biopsy and endocervical
25 curettage. AR 131-136. The pathology report noted a colposcopic diagnosis of HG lesion and
26 other clinical findings of a polyp. AR 137.
27       On April 2, 2002, Plaintiff requested a refill of her Flovent inhaler. AR 161.
28

On April 4, 2002, Plaintiff sought treatment at Kern Medical Center. She reportedly stopped taking her Paxil medication. She complained of dizziness and sleepiness, with difficulty thinking and driving. AR 130. She was prescribed Celexa. AR 130.

On April 24, 2002, Plaintiff had a cervical LEEP and specimens were taken from her cervix following an abnormal pap smear. AR 123-125. The pathology report included a diagnosis of focal mild to moderate squamous metaplastic dysplasia in the posterior lip of her uterine cervix, focal moderate squamous metaplastic dysplyasia extending to the endocervical margin in the anterior lip of her uterine cervix, and focal mild atypical endocervical gland hyperplasia, detached minute portions of squamous epithelium with mild squamous metaplastic dysplasia of the apical lip. AR 124-125.

On April 29, 2002, Plaintiff sought treatment for anxiety and asthma. AR 159. She received prescriptions for a proventil inhaler and Clonazepan (Generic for Klonopin). AR 159-160.

On May 24, 2002, Plaintiff sought treatment at Kern Medial Center for complaints of neck pain and sharp back pain. AR 120. She was assessed with hypothyroidism, scoliosis, arthritis and asthma. She was prescribed Albuterol, Celebrex, and Tylenol. Lab tests were ordered. AR 120.

On June 4, 2002, Plaintiff sought treatment at Kern Medical Center for her anxiety. AR 117. She complained that her Celexa did not work and she requested "Klonepin." Her Celexa was discontinued and she was prescribed Elavil. AR 117. Plaintiff also reported that her back pain was controlled with Celebrex and her asthma was under control. AR 117. The provider assessed her with back pain, anxiety, scoliosis and asthma. She was continued on her Celebrex. AR 117.

On June 4, 2002, Plaintiff underwent a CBC, cardiovascular evaluation, basic metabolic panel, TSH and Free T4 evaluation. AR 118-119. Her cardiovascular evaluation was within the reference range. AR 118.

On July 31, 2002, Plaintiff sought emergency medical treatment at Kern Medical Center for complaints of right side pain in her lower chest wall for two weeks after doing yard work.

AR 113-116. She was prescribed Vioxx for pain and instructed to follow-up at the medical clinic. AR 114-115.

On August 6, 2002, Plaintiff sought treatment for complaints of anxiety and back pain. She requested a refill of Klonopin. The provider denied her medication refill request and recommended evaluation of her back pain. AR 158.

On September 25, 2002, Plaintiff returned to Kern Medical Center for a follow-up appointment. AR 112. Plaintiff reported that she experienced "crying spells" when she ran out of Elavil. She also reported her asthma was well controlled with two inhalers. AR 112. The provider assessed her with back pain, anxiety, scoliosis, asthma, hypothyroidism, depression and insomnia. She was prescribed fiber for constipation, Celexa, Elavil and Motrin. AR 112. Her Celebrex was discontinued. AR 112.

On December 13, 2002, Plaintiff underwent a consultative internal medicine examination by Tomas B. Rios, M.D. AR 170-173. Plaintiff complained to Dr. Rios of chronic pain in her back and of asthma. AR 170. She reported that she was able to drive a vehicle and was independent in activities of daily living. AR 170.

Following a physical examination, Dr. Rios diagnosed Plaintiff with thoracolumbar scolioses, mechanical back pain, asthma, and hypothyroidism. AR 173. He indicated that her allegation of labor restricting complications from chronic back pain was significant since she had structural scolioses with mechanical neck and low back pain. He noted that she had preserved lumbar flexion/extension maneuver without any findings suggestive of root irritation. Dr. Rios opined that Plaintiff should be precluded from activities that require her to perform frequent bending, stooping, crouching or very heavy lifting beyond 50 pounds on an occasional basis or 25 pounds on a frequent basis. AR 173. Dr. Rios also opined that Plaintiff's asthma appeared to be clinically controlled, but that she should be precluded from working in an enclosed environment where there was frequent exposure to smoke, dust or fumes that could exacerbate her reactive airway disease. AR 173. With regard to Plaintiff's hypothyroidism, Dr. Rios indicated that Plaintiff appeared clinically euthyroid. AR 173.

1       On December 13, 2002, Plaintiff also underwent a lumbar spine series of films. AR 174. J. Norman Liu, M.D., opined that Plaintiff had scoliosis and mild disc space narrowing at L4-5. AR 174.

        On January 6, 2003, Shailesh C. Patel, M.D., conducted a consultative psychiatric examination of Plaintiff. AR 175-177. Upon mental status examination, Plaintiff's affect was tearful at times and she was "extremely labile." AR 176. She would cry frequently and have difficulty stopping. She reported her current mood as "pretty good." AR 176. Plaintiff denied suicidal and homicidal ideations. Dr. Patel noted no delusions or obsessions. AR 176. Plaintiff was alert and oriented, with fair insight and judgment. AR 176-177.

        Dr. Patel diagnosed Plaintiff with dysthymia, alcohol dependence (reportedly in remission), bronchial asthma and back problems, a history of alcohol problems and legal problems taking care of children. AR 177. Dr. Patel opined that Plaintiff's prognosis was fair. AR 177. She had the ability to deal with co-workers, supervisors and the public. She had the ability to do simple jobs, but may have difficulty doing complex jobs. She had adequate attention and concentration and would be able to sustain them for two hour increments. AR 177. Plaintiff had fair ability to do eight hours of work. She needed assistance handling her funds because of her alcohol problems. AR 177.

        On January 29, 2003, Plaintiff went for a follow-up appointment at the OB/GYN clinic at Kern Medical Center. AR 218-219. She had a liquid based PAP test performed, which showed negative for intraepithelial lesion or malignancy. AR 220.

        On February 4, 2003, Arthur Jing, M.D., completed a Physical Residual Functional Capacity Assessment form. AR 197-204. Dr. Jing opined that Plaintiff occasionally could lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday. AR 198. She had limited pushing and/or pulling with her lower extremities. AR 198. She occasionally could climb and stoop and frequently balance, kneel, crouch and crawl. AR 199. She had no manipulative, visual or communicative limitations. AR 200-201. She should avoid concentrated exposure to fumes,

odors, dusts, gases, and poor ventilation.  AR 201.  On June 17, 2003, Elpidio Fonte, M.D., reviewed the evidence in Plaintiff's file and agreed with Dr. Jing's assessment.  AR 203.

On February 18, 2003, psychiatrist Harvey Biala, M.D., completed a Mental Residual Functional Capacity Assessment form.  AR 178-182.  Dr. Biala concluded that Plaintiff had moderate limitations in the ability to understand and remember detailed instructions and in the ability to carry out detailed instructions.  AR 178.  He opined that she was able to understand and remember adequately to perform simple routine and repetitive tasks (nothing complex), able to sustain concentration and persistence for 2-hour intervals, able to interact adequately with public, peers and supervisors in basic work situations, and able to adapt to normal work environment situations at "SRT level."  AR 180.

On February 18, 2003, Dr. Biala also completed a Psychiatric Review Technique form. AR 183-196.  Dr. Biala determined that an RFC assessment was necessary and that Plaintiff had coexisting non-mental impairments.  He opined that Plaintiff had affective disorders and substance addiction disorders.  AR 183.  Dr. Biala concluded that Plaintiff had a medically determinable impairment of dysthymia.  AR 186.  She also had alcohol abuse in early remission. AR 191.  He further opined that Plaintiff had mild limitations on activities of daily living, mild difficulties maintaining social functioning, and mild difficulties maintaining concentration, persistence or pace.  AR 193.  In June 2003, state agency physician Elpidio Fonte, M.D., reviewed the evidence in Plaintiff's file and agreed with the assessment of Dr. Biala as written. AR 183.  In July 2003, state agency psychiatrist Luyen T. Luu also reviewed the file and agreed with Dr. Biala's assessment.  AR 183.

On April 29, 2003, Plaintiff sought follow-up treatment at Kern Medical Center for complaints of dull back pain and heartburn.  The provider assessed Plaintiff with depression, hypothyroidism, asthma, scoliosis and cervical cancer.  The provider discontinued Plaintiff's Celexa and prescribed Prozac.  AR 215.

On May 14, 2003, Plaintiff declined an examination in the OB/GYN clinic at Kern Medical Center.  AR 213.  Plaintiff reported that she could not afford to pay.  AR 213.

On August 7, 2003, Kern Medical Center requested a consultation for Plaintiff from mental health services. AR 225.

ALJ's Findings

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability. AR 12, 15. The ALJ also found that Plaintiff had scoliosis and dysthymia or depression, which significantly affected her ability to perform basic work-related activities and were considered "severe." AR 12, 15. The ALJ concluded that these impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. AR 15. The ALJ found that Plaintiff's allegations regarding her limitations and the written evidence from her family members were not totally credible. AR 15. He also found that Plaintiff retained the residual functional capacity ('RFC") to lift up to 20 pounds occasionally, frequently lift and carry up to 10 pounds, sit, stand or walk for 6 hours in an 8-hour day, and occasionally climb, stoop, and crouch. Plaintiff had the mental capacity to understand, remember, and carry out simple instructions. AR 15. She must avoid exposure to pulmonary irritants. AR 15. Plaintiff did not have past relevant work. The ALJ concluded that she had the RFC to perform a wide range of light work. AR 15. Therefore, the ALJ used Medical-Vocational Rule 202.13 as a framework and determined that Plaintiff was not disabled. AR 15-16. He also concluded that Plaintiff's capacity for light unskilled work has not been substantially compromised by her nonexertional limitations. AR 16.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means more than a mere scintilla, *Richardson v. Perales*, 402 U.S. 389, 401 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (internal quotation marks and citation omitted). The record as a whole must be considered,

weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the correct legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## **REVIEW**

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. § 416.920 (a)-(g) (2004). Applying the evaluation process in this case, the ALJ found that Plaintiff (1) had not engaged in substantial gainful activity since the alleged onset of disability; (2) has an impairment or a combination of impairments that is considered "severe" (scoliosis and dysthymia or depression) based on the requirements in the Regulations (20 C.F.R. § 416.920(c) (2004)); (3) does not have an impairment or combination of impairments that meets or equals one of the impairments set forth in Appendix 1 to Subpart P of Part 404; (4) did not have past relevant work; and (5) despite non-exertional limitations, could perform a wide range of light, unskilled work. AR 15-16.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence. Specifically, Plaintiff contends that (1) her non-exertional limitations significantly limit her ability to perform a wide range of unskilled light and sedentary work and (2) the ALJ erred by applying the Medical-Vocational Guidelines ("Grids") and not utilizing the services of a vocational expert.

## DISCUSSION

A.   Application of the Grids/Vocational Expert Testimony

Plaintiff argues that the ALJ erred in applying the Grids and not utilizing the services of a vocational expert because she has non-exertional limitations that limit her range of work. In general, where a claimant suffers only from exertional limitations, e.g., strength limitations, the ALJ may apply the Grids at step five to match the claimant with the appropriate work. *Reddick v. Chater*, 157 F.3d 715, 729 (9th Cir. 1998). The ALJ may apply the Grids in lieu of taking vocational expert testimony only when the Grids accurately and completely describe the claimant's abilities and limitations. *Id.* (citing *Jones v. Heckler*, 760 F.2d 993, 998 (9th Cir. 1985)). However, an allegation of a non-exertional limitation does not automatically preclude application of the Grids. *Desrosiers v. Secretary of Housing and Health Services*, 846 F.2d 573, 577 (9th Cir. 1988). A claimant's non-exertional limitations must "significantly limit the range of work" she can perform to render mechanical application of the Grids inappropriate and thereby requiring a vocational expert to describe what, if any, jobs existed in the national economy that the claimant could perform. *Id.* The determination of whether a non-exertional limitation significantly limits the range of work the claimant is able to perform is left to the ALJ. *Id.* In this instance, Plaintiff alleges two nonexertional limitations: (1) a mental impairment limitation to simple instructions and (2) an environmental restriction to avoid pulmonary irritants.

1.   Mental Impairment

Plaintiff argues that she has a non-exertional mental impairment that significantly affects her capacity to perform unskilled jobs because she is limited to simple instructions. A severe impairment is one that significantly limits the physical or mental ability to perform basic work

activities. 20 C.F.R. § 416.921(a). Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). Examples of basic work activities include "[u]nderstanding, carrying out, and remembering simple instructions" and "use of judgment." 20 C.F.R. § 416.922(b)(3),(4) (2004). Here, the ALJ determined that Plaintiff had the capacity to understand, remember and carry out simple instructions. AR 13. In reaching this determination, the ALJ gave substantial weight to the January 2003 consultative psychiatric evaluation completed by Dr. Patel. AR 14. Following a mental status examination of Plaintiff, Dr. Patel opined that Plaintiff had the ability to do simple jobs, but may have difficulty doing complex jobs. She also had fair insight and judgment. AR 177. Additionally, state agency psychiatrist Harvey Biala, M.D., opined that Plaintiff only had moderate limitations in the ability to understand and remember detailed instructions and in the ability to carry out detailed instructions. AR 178. He further opined that she was able to understand and remember adequately to perform simple routine and repetitive tasks (nothing complex), able to sustain concentration and persistence for 2-hour intervals, able to adequately interact with public, peers and supervisors in basic work situations, and able to adapt to normal work environment situations at SRT level. AR 180. There are no treatment records to contradict Dr. Patel's and Dr. Biala's conclusions and Plaintiff does not cite any contrary evidence indicating her mental impairment prevents her from performing basic work activities.

Insofar as Plaintiff contends she only can perform jobs requiring a reasoning level of 1 and cannot perform jobs requiring a reasoning level of 2 as outlined in the Dictionary of Occupational Titles ("DOT"), this contention is without merit. According to the DOT, level 1 reasoning development is the ability to "apply commonsense understanding to carry out simple one- or two-step instructions...[and] ...[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Dictionary of Occupational Titles*, Appendix C, Components of the Definition Trailer (4th ed. 1991). The opinions of consultative examiner Dr. Patel and state agency psychiatrist Dr. Biala both confirm that Plaintiff can carry out simple instructions and complete simple routine and repetitive tasks. AR 177, 178.

Pursuant to the DOT, level 2 reasoning development is the ability to "apply

commonsense understanding to carry out detailed but uninvolved written or oral instructions...[and]...[d]eal with problems involving a few concrete variables in or from standardized situations." *Dictionary of Occupational Titles*, Appendix C, Components of the Definition Trailer (4th ed. 1991). There is no indication in the record that Plaintiff is unable to perform level 02 reasoning. Although Plaintiff was limited to simple instructions, Dr. Biala did not indicate that this limitation included only one- or two-step instructions. AR 176-177. In addition, the state agency psychiatrist, Dr. Biala, opined that she was able to understand and remember adequately to perform simple routine and repetitive tasks. AR 180. He also concluded that Plaintiff only had moderate limitations in her ability to understand and remember detailed instructions and in her ability to carry out detailed instructions. AR 178. He did not opine that she had marked limitations in this area or that she was incapable of carrying out detailed, but uninvolved instructions consistent with level 2 reasoning.

        2.        Pulmonary Limitations

Plaintiff also contests the ALJ's finding that her asthma is non-severe. Plaintiff bears the burden of proving that she is disabled. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); 20 C.F.R. § 404.1512. A person is disabled if her impairment is severe and meets the durational requirement of twelve months. 20 C.F.R. §§ 404.1505, 404,1520(a). A severe impairment is one that significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). An impairment or combination of impairments is found "not severe" if the medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(is) to perform basic work activities). SSR 85-28.

In determining whether an impairment or combination of impairments is "severe," an ALJ should carefully examine the medical findings that describe the impairments and make an "informed judgment" about the limitations and restrictions the impairment and related symptoms impose on the person's physical and mental ability to do basic work activities. SSR 96-3p.

Here, the ALJ determined that Plaintiff's asthma was controlled by medication and has only minimal, if any, effect on her ability to work. AR 12. In reaching this conclusion, the ALJ relied on Plaintiff's treatment records from Kern Medical Center. AR 12. In June 2002, a Kern Medical Center provider noted Plaintiff's asthma to be "under control." AR 117. In September 2002, a Kern Medical Provider also opined that Plaintiff's "asthma is well controlled." AR 112. Additionally, the ALJ relied on the opinion of the consultative examiner, Dr. Rios, who performed an internal medicine evaluation of Plaintiff in December 2002. AR 14, 170-173. Upon examination of Plaintiff's chest and lungs, Dr. Rios noted clear breath sounds, no adventitious sounds, and no wheezing, rates or rhonchi. AR 171. Dr. Rios concluded that Plaintiff's asthma appeared to be clinically controlled. AR 173. Due to her asthma, Dr. Rios indicated that Plaintiff should be precluded from working in an enclosed environment "where there is frequent exposure to smoke, dust or fumes." AR 173. State agency physician, Dr. Jing, corroborated Dr. Rios' findings, noting that Plaintiff should avoid "concentrated exposure" to fumes, odors, dust, gases, and poor ventilation. AR 201. There is no indication in the record that Plaintiff was precluded from all, or even moderate, exposure to pulmonary irritants.

Plaintiff further contends that the ALJ's finding precluding Plaintiff from working in environments with pulmonary irritants is a significant non-exertional limitation warranting the use of a vocational expert. In support of this argument, Plaintiff cites to Social Security Ruling ("SSR") 85-15. SSR 85-15 applies to "persons who have *only* a nonexertional limitation(s) of function or an environmental restriction(s)." SSR 85-15 (emphasis added), *see also* Sandgathe v. Chater, 108 F.3d 978, 980-981 (9th Cir. 1997), and Roberts v. Shalala, 66 F.3d 179, 183 (9th Cir. 1995). In this instance, Plaintiff has claimed not only non-exertional impairments, but also exertional limitations due to her back pain and scoliosis. AR 65. Thus, SSR 85-15 is inapplicable.

Even if SSR 85-15 applied, Plaintiff's environmental restriction would not warrant the services of a vocational expert. SSR 85-15 provides, "[w]here a person has a medical restriction to avoid excessive amounts of noise, dust, etc., the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc." SSR

85-15.  Consultation of occupational reference materials or the services of a vocational specialist are needed only when a person falls on the continuum between the ability to tolerate very little and the ability to tolerate all but excessive exposure to environmental conditions.  *Id.*  Here, the evidence demonstrates that Plaintiff's asthma was controlled by medication.  AR 112, 117, 173.  Her only environmental restriction was to avoid "frequent" or "concentrated" exposure to pulmonary irritants, such as fumes, odors, dusts, gases, and poor ventilation.  AR 173, 201.  Accordingly, a vocational expert would not be required pursuant to SSR 85-15, since she had the ability to tolerate essentially all but excessive exposure.

Additionally, SSR 83-14, which explains how to evaluate the vocational effects of nonexertional impairments where claimants also have severe exertional impairments that limit them to sedentary, light, or medium work, would not require the use of a vocational expert.  SSR 83-14 provides as follows:

> After it has been decided that an impaired person can meet the primary strength requirements of sedentary, light or medium work—sitting, standing, walking, lifting, carrying, pushing, and pulling—a further decision may be required as to how much of this potential occupational base remains, considering certain nonexertional limitations which the person may also have.

However, a particular additional non-exertional limitation may have very little effect on the range of work remaining that an individual can perform.  *Id.*  Environmental restrictions, such as the need to avoid exposure to feathers, would not significantly affect the potential unskilled light occupational base.   Where the adjudicator does not have a clear understanding of the effects of additional restrictions, a vocational specialist is required.  *Id.*  Here, the ALJ determined that Plaintiff had the RFC to perform light work, which was not substantially compromised by her non-exertional limitations.  AR 15-16.  For reasons already discussed, Plaintiff's environmental restriction to avoid frequent or concentrated exposure to fumes, odors, dusts, etc., would not significantly affect the potential unskilled light occupational base.  Accordingly, testimony from a vocational expert was not required.

In summary, the ALJ determined that Plaintiff's non-exertional limitations did not significantly limit the range of work she was able to perform.  The ALJ's determination was

supported by substantial evidence in the record.  Accordingly, the ALJ did not err by applying the Grids in lieu of taking vocational expert testimony.  *Desrosiers*, 846 F.2d at 577.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Brenda Belden.

IT IS SO ORDERED.

**Dated:     June 29, 2007**                                        **/s/ John M. Dixon**
                                                                                       UNITED STATES MAGISTRATE JUDGE